UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:16-CV-00808-TBR

HILLERICH & BRADSBY CO., INC.                                    PLAINTIFF

v.

CHRISTIE'S, INC., *et al.*                                       DEFENDANTS

### Memorandum Opinion and Order

Fifty years ago, a baseball bat once belonging to Hall of Famer George Sisler disappeared from the Louisville Slugger factory in Kentucky. Six months ago, Christie's, the famous New York auction house, sold Sisler's bat at auction to an unknown bidder. Today, Hillerich & Bradsby (H&B), manufacturer of the world-renowned Louisville Slugger, wants it back. May H&B hale the bat's consignor and auctioneer into court in Kentucky, or must H&B go to them?

In 2016, Christie's listed for sale the Louisville Slugger bat George Sisler used to smack his record-breaking 257th hit in the 1920 season. H&B says this was the first time it knew of the bat's whereabouts since it was stolen from H&B's factory in 1967. After negotiations for the bat's return fell through, Christie's sold it at auction for $137,500.00. H&B brought this suit against the bat's consignor, the bat's purchaser, and Christie's.[1] *See* [DN 13.] Defendants now move to dismiss H&B's complaint, arguing that this Court lacks personal jurisdiction over

---

[1] As explained in further detail below, Christie's transferred possession of the Sisler bat to an unknown purchaser during the pendency of this action. The Court allowed H&B to amend its complaint to add the purchaser as an additional John Doe defendant. *See* [DN 13.] To date, John Doe's identity is unknown to the Court, and he has not been served or otherwise appeared in this action. This opinion will refer to Mark Roberts, Roberts' two business entities, and Christie's as "Defendants."

them. [DN 14.] They assert that, aside from their former possession of the Sisler bat, they have no substantial connection to Kentucky. H&B contends that by transferring possession of the bat after H&B claimed that it was stolen, Defendants caused harm in Kentucky, rendering them amenable to suit in this forum. *See* [DN 20.]

To adjudicate this dispute on its merits, this Court must possess jurisdiction over not only the subject matter of the action, but also the parties to it. And in this diversity suit, the Court may only exercise personal jurisdiction over Defendants when courts of this Commonwealth could do so under Kentucky's long-arm statute. *Int'l. Tech. Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 391 (6th Cir. 1997). Here, no Defendant caused "tortious injury by an act or omission in this Commonwealth," so no personal jurisdiction exists under Kentucky law. KRS 454.210(2)(a)(3). And while it presents a closer question, this Court may not exercise jurisdiction over Defendants without running afoul of the federal due process clause, because no Defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum state." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Defendants' motion [DN 14] is GRANTED, and H&B's claims against them are dismissed.

I

George Sisler is widely regarded as "the first great first baseman of the twentieth century." Bill Lamberty, *George Sisler*, Society for American Baseball Research, https://goo.gl/SLcqhv. He joined the St. Louis Browns in 1915 as a

southpaw pitcher, but the Browns soon realized that Sisler's slugging was needed on a daily basis, and moved him to first base. *Id.* From 1916 to 1927, fans of the Browns never had to ask, "Who's on first?" – it was always "Gorgeous George." Sisler's longtime American League rival Ty Cobb described him as "the nearest thing to a perfect ballplayer" Cobb had ever seen. *Sisler, George*, Baseball Hall of Fame, https://goo.gl/LK4aNX. Even Justice Blackmun included Sisler in his list of ballplayers who "sparked the diamond and its environs and . . . provided tinder for recaptured thrills, for reminiscence and comparisons, and for conversation and anticipation in-season and off-season." *Flood v. Kuhn*, 407 U.S. 258, 263 (1972). Sisler was inducted into the Baseball Hall of Fame in 1939. Hall of Fame, *supra.* [2]

Although Sisler earned a reputation as an outstanding first baseman, his hitting prowess eclipsed even his fielding abilities. Sisler finished his career as the best player in St. Louis Browns history, with 2,812 hits and a .340 career batting average. Hall of Fame, *supra.* Sisler's 1922 campaign was particularly remarkable. He won the American League's first-ever Most Valuable Player award, and his .420 batting average "still stands as the third-best season average in modern baseball history." Lamberty, *supra.* Two years earlier, he batted an impressive .407 while swatting 257 hits, a single-season record. *Id.* Sisler's mark stood in a league of its own until 2004, when, with Sisler's descendants in

---

[2] Interestingly, Sisler was also involved in baseball's first players' rights dispute. Barney Dreyfuss, the owner of the Pittsburgh Pirates, claimed that he possessed the rights to Sisler because Dreyfuss purchased a minor league contract Sisler signed while he was in high school. Depak Sathy, *Reconstruction: Baseball's New Future*, 4 Seton Hall J. Sport L. 27, 41 n.53 (1994). The dispute was resolved after baseball's National Commission determined that the contract was void, as Sisler was only seventeen at the time he executed it. *Id.*

attendance, Seattle Mariners outfielder Ichiro Suzuki surpassed his record. *Ichiro visits Sisler's grave*, ESPN.com (July 15, 2009), https://goo.gl/wguFn9.

The lumber Sisler swung to accomplish his 257th hit is the subject of this case. Since 1894, Hillerich & Bradsby has manufactured baseball bats under the "Louisville Slugger" trademark. [DN 13 at 1.] Many of the game's all-time greats have wielded a Louisville Slugger. And on Sunday, October 3, 1920 at Sportsman's Park in St. Louis, so too did George Sisler. *See* [*id.* at 4]; *Retrosheet Boxscore: St. Louis Browns 16, Chicago White Sox 7*, Retrosheet, https://goo.gl/n8XTqE. Following his retirement, Sisler returned the record-breaking bat to H&B to be used for promotional purposes. [DN 13 at 4.] Apparently believing if they built it, the fans would come, H&B constructed a traveling "Old Timers Bat Display" that included Sisler's bat and several others. [*Id.*] In October 1967, H&B loaned the display to the Mercantile Trust Company in St. Louis to celebrate World Series week. [*Id.* at 5.] Following the St. Louis Cardinals' victory in Game 7, the display was returned to H&B in Louisville.

Then George Sisler's baseball bat went missing.

The parties dispute how and why the bat disappeared. Defendants claim that Sisler's bat and others were discarded by H&B and given to an employee, Rex Bradley. [DN 14 at 3.] Bradley sold the bats, including Sisler's, piecemeal from his garage. [*Id.*] According to Defendants, Sisler's bat was sold and resold three times prior to 2016. [*Id.*] However, for the purpose of resolving Defendants' motion, the Court will accept as true H&B's well-pleaded factual allegation that the

bat was stolen from the Louisville Slugger factory. [DN 13 at 6]; *see Binno v. Am. Bar. Assoc.*, 826 F.3d 338, 344 (6th Cir. 2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

In any event, H&B says it knew nothing of the whereabouts of the Sisler bat until Christie's listed it for auction in New York City. [DN 13 at 5.] Christie's is an auction house that offers valuable art and memorabilia for sale to buyers worldwide. [*Id.* at 3.] Bidders can participate in live auctions in person, on the phone, or via the internet. In addition, Christie's hosts a number of online-only auctions. Christie's catalogue described the Sisler bat as follows:

> An un-cracked, Hillerich & Bradsby, Pre Model number bat dating from the 1916-20 labeling period with the signature *George Sisler* emblazoned upon the barrel. Exhibits heavy use with a chip on the knob, many ball marks visible on the right, left and back barrel (ball marks include green ink transfers), bat rack streaks, defined lathe marks in the handle, a moderate coat of pine tar on the upper handle and small nails removed from the barrel. A label from the Louisville Slugger traveling display is affixed to the front barrel attributing this bat to George Sisler's 257th hit of the 1920 season, a record number of hits in a season that would stand for 84 years (the label misidentifies the hit as a home run). The Louisville Slugger traveling display was used as a marketing tool for the company and features 20 bats of the greatest hitters in the game. The display was used by the company for over forty years. Hall of Famer George Sisler (1893-1973) played for the St. Louis Browns from 1915-1927, during the labeling period of the offered bat. Authenticated and graded by PSA/DNA *GU 10*.

*George Sisler Professional Model Bat*, Christie's, https://goo.gl/N8TLbv. H&B later learned the bat was consigned for sale by its then-owner, California resident Mark Roberts. Roberts founded and currently manages two business entities: 33 Collections LLC, a California limited liability company, and 33 Baseball Foundation, a Delaware corporation headquartered in California. [DN 13 at 3.]

Through his companies, Roberts operates www.TheNationalPastimeMuseum.com, an online museum that displays pictures of historical baseball artifacts for its virtual patrons. [*Id.*] Roberts says that in 2010, he purchased the Sisler bat from Leland's, another New York auction house, for $152,647.15. [DN 14-2.] He kept the bat for a few years, and then consigned it with Christie's. [*Id.*]

After Christie's listed the Sisler bat alongside other memorabilia in its "Golden Age of Baseball" auction, H&B contacted Christie's, claiming the bat was rightfully H&B's. [DN 13 at 6.] The two parties corresponded, each asking the other to prove ownership. During this time, H&B was unaware Roberts was the bat's consignor. After negotiation proved unavailing, H&B filed suit in state court, naming as defendants Christie's and the then-anonymous consignor of the Sisler bat. [DN 1-3.] Defendants removed H&B's suit to this Court, unmasking Roberts and his companies in the process. [DN 1.] Thereafter, Christie's sold the bat to an as-yet-unknown buyer for $137,500.00, and transferred possession of the bat to the buyer in New York. [DN 13 at 6.] H&B amended its complaint to name this John Doe, not believed to be a Kentucky resident, as an additional defendant. *See* [*id.*] H&B seeks a declaration that it is the bat's true owner and either a writ of replevin ordering the bat's return or compensation for its loss. [*Id.* at 7-8.]

Roberts, Roberts' companies, and Christie's jointly moved to dismiss, arguing that this Court lacks personal jurisdiction over them. [DN 14.] H&B responded, [DN 20], and Defendants replied, [DN 21]. Fully briefed, Defendants' motion is ripe for adjudication.

II

Under Rule 12(b)(2), a defendant may challenge the Court's authority to entertain an action against him for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). In diversity cases, the Court's exercise of personal jurisdiction must not only be authorized by the forum state's long-arm statute, but also must comport with the Due Process Clause of the Fourteenth Amendment. *Daimler AG v. Bauman*, ___ U.S. ___, 134 S. Ct. 746, 753 (2014); *accord Brunner v. Hampson*, 441 F.3d 457, 463 (6th Cir. 2006). When the Court decides the jurisdictional question based solely upon the parties' written submissions, the plaintiff bears the burden of making a *prima facie* showing that personal jurisdiction exists. *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016) (quoting *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007)). "In that instance, the pleadings and affidavits submitted must be viewed in the light most favorable to the plaintiff," and the Court must "not weigh the controverting assertions of the party seeking dismissal." *Air Prods.*, 503 F.3d at 549 (cleaned up).

III

A

The origins of the doctrine of *in personam* jurisdiction precede even those of America's pastime.[3] At common law, courts refused to enforce foreign judgments when the defendant did not appear in the original action and was not served within the territorial jurisdiction of the court rendering the judgment. 4 Charles Alan

---

[3] Baseball historians generally agree that the earliest recorded game of organized baseball was played June 19, 1846 at Hoboken, New Jersey's Elysian Fields. The New York Nine thumped the Knickerbockers 23 to 1. *Flood v. Kuhn*, 407 U.S. 258, 260-61 (1972).

Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1064 (4th ed. 2017) (citing *Buchanan v. Rucker*, 9 East 192 (K.B. 1808)). The concept of territoriality, as it came to be known, soon found its way into American jurisprudence. *Id.* (citing *Mills v. Duryee*, 11 U.S. 481, 7 Cranch 481 (1813) (Johnson, J., dissenting)). A classic case with facts more convoluted than the infield fly rule, *Pennoyer v. Neff*, 95 U.S. 714, 5 Otto 714 (1877), illustrates this principle. Marcus Neff hired Oregon attorney John Mitchell to help him secure a federal land grant. While Neff's efforts to procure the grant were ongoing, Mitchell brought suit against Neff in Oregon to recover unpaid legal fees. Neff, a non-resident of Oregon, was never personally served; instead, pursuant to an Oregon statue, Mitchell accomplished service via publication in a local newspaper. After Neff failed to appear, Mitchell obtained a default judgment against him. Shortly thereafter, the government awarded Neff title to a tract, and Mitchell levied his judgment against Neff's newly-acquired land. Mitchell then purchased the land at a sheriff's sale and assigned it to Sylvester Pennoyer.

Neff sued Pennoyer to recover the Oregon land. The Supreme Court ruled in Neff's favor, holding the original default judgment against him was invalid. Because "every State possesses exclusive jurisdiction and sovereignty over persons and property within its territory," Justice Field wrote, "the laws of one State have no operation outside of its territory, except so far as is allowed by comity; and . . . no tribunal established by it can extend its process beyond that territory so as to subject either persons or property to its decisions." *Id.* at 722. Mitchell had not

accomplished service on Neff while Neff was physically present in Oregon, nor had he attached Neff's land at the outset of the suit – indeed, when Mitchell first sued Neff, Neff had yet to be awarded the land grant. The Oregon court never achieved jurisdiction over Neff, so its disposition of his property was set aside.

Territoriality carried the day on into the early twentieth century. But just as the dead-ball era gave way to power hitters like Babe Ruth and George Sisler, so too did the strict requirement of territoriality. Wright & Miller, *supra*, at § 1065 (discussing cases). And in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), the Supreme Court established the basis of the modern personal jurisdiction doctrine. The State of Washington sought to recover unpaid contributions to the state's unemployment compensation fund from the International Shoe Company, a Delaware corporation headquartered in St. Louis, Missouri. *Id.* at 311-12. International Shoe owned no stores in Washington. *Id.* at 313. Instead, it employed a dozen traveling salesmen, paid on commission, who displayed sample shoes to prospective customers and transmitted orders to the main office. *Id.* at 313-14. The company then fulfilled the orders by mail. *Id.* at 314. Washington served notice of the tax assessment on one of the salesman while he was present in the state, and also sent notice via registered mail to International Shoe's St. Louis headquarters. *Id.* at 312. International Shoe argued "that its activities within [Washington] were not sufficient to manifest its 'presence' there and that in its absence the state courts were without jurisdiction, [and] consequently it was a denial of due process for the state to subject [it] to suit." *Id.* at 315.

The Court disagreed. As Chief Justice Stone recognized, "[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). When a corporation's activities within a state are "continuous and systematic" and "give rise to the liabilities sued on," the corporation is "presen[t]" in the forum and may subjected to suit. *Id.* at 317. "Conversely . . . the casual presence of the corporate agent or even his conduct of single or isolated items of activities in a state in the corporation's behalf are not enough to subject it to suit on causes of action unconnected with the activities there." *Id.* (citations omitted). The Court concluded that International Shoe's contacts with the forum were "systematic and continuous" such that the company could be sued in Washington for obligations arising out of its activities in the state. *Id.* at 320. In subsequent cases, the Court extended the *International Shoe* "minimum contacts" doctrine to suits against individuals as well as corporations. *See, e.g.*, *Calder v. Jones*, 465 U.S. 783 (1984).

Whether a court's exercise of personal jurisdiction comports with due process "must depend . . . upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." *Int'l. Shoe*, 326 U.S. at 319. This inquiry is further complicated when, as here, jurisdiction is alleged to have arisen from the in-state acts of a non-

resident defendant – a variety of personal jurisdiction known as specific jurisdiction. While there is no "mechanical or quantitative" formula, *id.*, the Sixth Circuit has crafted a three-pronged test used to determine whether the exercise of specific personal jurisdiction comports with due process:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Mach. Co. v. Mohasco Indust., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).

## B

The jurisdictional inquiry does not, however, begin and end with the federal due process clause. Citizens of the United States owe allegiance to two sovereigns, one state and one federal, each with its own peculiar set of laws. And because of this system of dual sovereignty, when a federal court sits in diversity, it "may not exercise jurisdiction over a defendant unless courts of the forum state would be authorized to do so by state law." *Int'l. Tech. Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 391 (6th Cir. 1997) (citation omitted). This Court must assess the propriety of personal jurisdiction through the dual lenses of Kentucky's long-arm statute and the federal due process clause. *Stolle Mach. Co. v. RAM Precision Indust.*, 605 F. App'x 473, 480 (6th Cir. 2015).

Either through express language or judicial interpretation, some long-arm statutes run co-extensive with due process. *E.g., Mohasco*, 401 F.2d at 377. That

used to be the case in the Commonwealth. Kentucky's long-arm statute, KRS 454.210, lists nine separate ways a non-resident may subject itself to jurisdiction in the state. The statute further requires that the plaintiff's claim must "aris[e] from" one of those nine specified acts. KRS 454.210(2)(b). Until recently, Kentucky courts interpreted KRS 454.210 "to reach the full constitutional limits of due process in entertaining jurisdiction over non-resident defendants." *Wilson v. Case*, 85 S.W.3d 589, 592 (Ky. 2002) (citations omitted). However, the Kentucky Supreme Court reversed course in *Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51 (Ky. 2011). There, a frequent casino patron alleged she slipped on a pat of butter the casino had negligently allowed to remain on the floor near the buffet, causing her to fall. *Id.* at 53. She sued the casino in Shelby County, Kentucky, where she lived. *Id.* The casino, a floating gambling boat, was docked just across the state line in Indiana. *Id.* It advertised heavily in Kentucky, sponsored several Kentucky charitable and civic events, and derived half its business from Kentucky citizens. *Id.* The Kentucky Court of Appeals reversed the trial court's dismissal for lack of personal jurisdiction, finding that jurisdiction was proper based upon Caesars' "substantial business" and "continuous and systematic contacts within Kentucky." *Id.* at 54.

The Kentucky Supreme Court cried foul, overruling *Wilson*. Looking to the plain language of KRS 454.210, the court recognized that "the long-arm statute discloses no language indicating that its provisions should, *per se*, be construed as coextensive with the limits of federal due process." *Id.* at 56. Although the nine

enumerated bases of jurisdiction in KRS 454.210 "should be liberally construed in favor of long-arm jurisdiction, their limits on jurisdiction must be observed as defined." *Id.* Further, "the plaintiff's claim must still 'arise' from [the enumerated] conduct or activity before long-arm jurisdiction exists." *Id.* Ultimately, the court held that while Caesars did transact business within the Commonwealth, a basis of jurisdiction under the long-arm statute, its alleged failure to keep its premises safe did not arise from its advertising and business activities in Kentucky. *Id.* at 59.

Following *Caesars* and its progeny, then, courts applying Kentucky law must engage in a two-part inquiry. First, the Court must "determine if the cause of action arises from conduct or activity of the defendant that fits into one of the [long-arm] statute's enumerated categories." *Id.* at 57. Second, the Court must "determine if exercising personal jurisdiction over the non-resident defendant offends his federal due process rights." *Id.*

## IV

## A

H&B relies upon only one provision of Kentucky's long arm statute, "[c]ausing tortious injury by an act or omission in this Commonwealth." KRS 454.210(2)(a)(3). It claims that by "receiv[ing] property taken from Kentucky without authorization" and by "deliver[ing] possession of the Sisler Bat to an unknown purchaser," all while knowing of H&B's adverse claim to the bat, Defendants subjected themselves to jurisdiction in Kentucky. [DN 20 at 8.]

Defendants counter that because they committed no act and transacted no business in Kentucky, any consequences that may have been felt by H&B in Kentucky are immaterial to the Court's personal jurisdiction analysis. [DN 21 at 4.]

*Caesars* makes clear that the language of Kentucky's long-arm statute matters. Courts "are not at liberty to add or subtract from the legislative enactment or interpret it at variance from the language used." *Caesars*, 336 S.W.3d at 56. In turn, KRS 454.210(2)(a)(3) plainly states that the act or omission giving rise to the tortious injury must occur in the Commonwealth. If H&B is to be believed, a tortious act occurred in Kentucky when an unknown thief stole the Sisler bat from its Louisville home sometime after the 1967 World Series. But H&B does not allege that any Defendant was complicit in that act of conversion, nor does it claim that any Defendant purchased the Sisler bat with knowledge that it was stolen. While the Sisler bat may have been wrongfully removed from H&B's Louisville factory, H&B avers no facts suggesting that Defendants were complicit in that removal. Whether or not Defendants committed a tort by transferring possession of the bat after H&B made its claim of ownership is not for this Court to decide, because they did not act within Kentucky's borders.

A further look at the surrounding statutory text confirms this result. The next subsection, KRS 454.210(2)(a)(4), allows personal jurisdiction when a person causes "tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business . . . in this Commonwealth, provided that the tortious injury occurring in this Commonwealth arises out of the

doing or soliciting of business." Thus, it is possible for a defendant to be sued in Kentucky when in-state harm results from an out-of-state act. But in order for such a suit to be brought, the defendant must be engaged in business activity within Kentucky, and the plaintiff's claim must arise from that activity.

That is not the case here. While it might be possible for a person in Kentucky to virtually visit Mark Roberts' online baseball museum or purchase an item from a Christie's online auction, H&B does not claim that Defendants have persistent contacts with the Commonwealth such that they are amenable to suit under the "doing business" subsection of Kentucky's long-arm statute. In essence, H&B asks this Court to judicially create a new subsection to KRS 454.210(2)(a) that would permit the exercise of personal jurisdiction when a single out-of-state act or omission, committed by a person with no substantial connection to Kentucky, causes in-state harm. Kentucky courts routinely balk at this same argument. In one case, the plaintiff, a Kentuckian, was hit by a pickup truck while riding his bike. *Allen v. Jones*, 372 S.W.3d 441, 443 (Ky. Ct. App. 2012). The driver, also a Kentucky resident, had recently purchased the vehicle in Tennessee from a private party, but the title had not yet been transferred and the truck was uninsured. *Id.* The plaintiff brought a negligent entrustment suit against the Tennessee seller. The Kentucky Court of Appeals upheld the trial court's dismissal for want of *in personam* jurisdiction, because the seller "did not transact business in Kentucky, did not contract to supply goods or services in Kentucky, and did not cause tortious injury by an act or omission in Kentucky." *Id.* at 445. Similarly, in a line of

medical malpractice cases, Kentucky courts reject personal jurisdiction when a Kentucky plaintiff alleges that a non-resident physician committed malpractice at an out-of-state hospital or clinic. *Powers v. Park*, 192 S.W.3d 439 (Ky. Ct. App. 2006); *Pierce v. Serafin*, 787 S.W.2d 705, 707 (Ky. Ct. App. 1990).

While KRS 454.210 "should be liberally construed in favor of long-arm jurisdiction," *Caesars*, 336 S.W.3d at 56, courts may not conjure jurisdiction from whole cloth. Here, Kentucky's long-arm statute plainly sets out nine ways – and nine ways only – that a non-resident defendant subjects itself to the jurisdiction of the Commonwealth's courts. H&B's amended complaint does not fall into one of these delineated categories.

B

Likewise, this Court cannot assert personal jurisdiction over Defendants without running afoul of the federal due process clause. For H&B to hale Defendants into this Court, they must have purposefully availed themselves of acting in Kentucky or causing a consequence here, their activities in Kentucky must give rise to H&B's cause of action, and their acts or the consequences of their actions "must have a substantial enough connection with [Kentucky] to make the exercise of jurisdiction . . . reasonable." *Southern Mach. Co. v. Mohasco Indust., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). H&B's suit falters at the first prong, purposeful availment.

The Supreme Court has suggested that the due process analysis "shifts slightly when the application of the purposeful availment prong turns on a tort or

fraud-based claim." *D.C. Micro Dev., Inc. v. Lange*, 246 F. Supp. 2d 705, 709 (W.D. Ky. 2003) (citing *Calder v. Jones*, 465 U.S. 783 (1984)). In *Calder*, the Court held that a California court could exercise jurisdiction over National Enquirer reporters who authored an allegedly libelous article about the plaintiff, actress and singer Shirley Jones. *Id.* at 791. Because "[t]he article was drawn from California sources, and the brunt of the harm . . . was suffered in California," the Court said, "[j]urisdiction . . . is therefore proper in California based upon the 'effects' of [defendant's] Florida conduct in California." *Id.* at 788-89 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980)). Based upon the *Calder* "effects" test, this Court has recognized that "in an intentional tort-based action, purposeful availment has been found where a non-resident defendant engaged in wrongful conduct targeted at a plaintiff in the forum state." *Spectrum Scan, LLC v. AGM Cal.*, 519 F. Supp. 2d 655, 660 (W.D. Ky. 2007) (quoting *Kerman v. Chenery Assoc., Inc.*, No. 3:06-CV-338-S, 2007 WL 2363283, at *2 (W.D. Ky. Aug 14, 2007)). Still, "the mere allegation of intentional tortious conduct which has injured a forum resident does not, by itself, always satisfy the purposeful availment prong." *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 552 (6th Cir. 2007) (citation omitted).

H&B cites several cases purporting to hold that the mere possession of stolen goods renders one amenable to suit wherever the act of conversion occurred. It leans heavily on *Filipowski v. Rogovin*, No. 00-CV-0813, 2000 WL 983727 (N.D. Ill. Jul. 17, 2000). There, Andrew Filipowski, an Illinois comic book collector, alleged

New York defendants Robert Ragovin and Steven Fishler conspired with nondefendant Jeremiah Boyd to purchase comic books Boyd stole from Filipowski. *Id.* at *1. The defendants denied knowing the books were stolen, but admitted they paid Boyd only 20% of the books' fair market value. *Id.* at *4. Accepting as true Filipowski's well-pleaded factual allegation that the defendants had constructive knowledge they were purchasing stolen goods, the district court held "it is fair, just, and reasonable to require defendants to answer suit in Illinois." *Id.* However, the court also observed, "If it could be assumed defendants were good-faith purchasers, there would be stronger support for finding no specific jurisdiction." *Id.* (citation omitted). In another case, *Pag-Daly City, LLC v. Quality Auto Locators, Inc.*, No. C 12-03907 WHA, 2013 WL 4510392, at *1 (N.D. Cal. Aug. 22, 2013), a car dealership alleged non-resident dealerships and car brokers conspired together to prevent it from receiving certain vehicles into its inventory. The court held the defendants could be haled into court in California because they "repeatedly and knowingly consummated transactions that prevented cars from reaching the [plaintiff's] inventory." *Id.* at *3.

The Sixth Circuit has also suggested that a knowing recipient of stolen materials purposefully avails itself of the jurisdiction where the initial theft occurred. *See Stolle Mach. Co. v. RAM Precision Indust.*, 605 F. App'x 473, 480-81 (6th Cir. 2015). In *Stolle*, a company that manufactured and serviced can-making equipment hired a Chinese-American engineer to work at its Ohio plant. *Id.* at 476. Shu An, the engineer, had access to Stolle's trade-secret design drawings.

*Id.* After he was fired for poor performance, An moved back to China, founded a company called SLAC Precision Equipment, and began competing with Stolle using the trade secrets he had acquired while in Stolle's employ. *Id.* at 476-78. Stolle brought suit against An and SLAC in Ohio. The Sixth Circuit concluded the district court's exercise of personal jurisdiction over both defendants comported with due process, observing that "An misappropriated technical and customer information while he was still employed by Stolle in Ohio and that An used information that he wrongly took from Stolle to found his competitor firm, SLAC, and to solicit customers." *Id.* at 480.

*Stolle*, *Filipowski*, and *Pag-Daly City* all demonstrate that personal jurisdiction over a non-resident defendant who actively participates or acquiesces in the conversion of property within the forum state does not offend due process. But this case is different. Again, H&B does not allege Defendants stole the Sisler bat, caused it to be stolen, or knew or should have known it was stolen when they received it. The uncontroverted facts of record demonstrate Roberts purchased the bat from Leland's and consigned it for sale with Christie's before H&B ever claimed ownership. Without knowing the bat was stolen from Kentucky, it can hardly be said that Defendants purposefully availed themselves of this forum. Defendants' ties to Kentucky arise only from the "unilateral activity of . . . [a] third person" – an unknown thief from five decades ago. *Air Prods.*, 503 F.3d at 549. But "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."

*Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Because Defendants "engaged in [no] wrongful conduct targeted at a plaintiff in [Kentucky]," they may not be haled into this Court by H&B. *Spectrum Scan,* 519 F. Supp. 2d at 660.

H&B's case is more similar to a case from this Court's sister court, *Crum v. Estate of Mayberry*, No. 14-84-ART, 2014 WL 7012122 (E.D. Ky. Dec. 11, 2014). There, the Martin County, Kentucky District Court adjudicated Phillip Crum to be disabled, and appointed his sister Vicki Mayberry, a Michigan resident, to be his guardian. *Id.* at *1. Crum alleged that Vicki proceeded to write checks on his account to benefit herself and her husband, Mark Mayberry. *Id.* The Eastern District of Kentucky granted Mark Mayberry's motion to dismiss, holding that "Crum cannot rely on the facts in his complaint alleging that Vicki Mayberry 'wrote checks' for her and Mark Mayberry's benefit to 'hale' Mark Mayberry into this Court." *Id.* at *3; *see also Jahner v. Jacob*, 252 N.W.2d 1, 8 (N.D. 1977) ("[I]f we assumed that a thief had stolen property in North Dakota and delivered the property to a person outside the State who had no connection with the theft, we could not hold that the recipient was subject to the process of our courts.").

Taking H&B's allegations as true, Defendants are merely innocent recipients of stolen property who had no connection with the theft. They had no contact with this forum until H&B reached out to them, claiming ownership of the Sisler bat. H&B now asserts that by transferring possession of the bat to an unknown purchaser after H&B made its claim, Defendants purposefully availed themselves of Kentucky's laws. But H&B cannot force Defendants to play on its home diamond

when Defendants are not responsible for creating their own contacts with the Commonwealth.

Because H&B has failed to make a *prima facie* showing that Defendants have purposefully availed themselves of this forum, the Court "need not dwell on" the final two prongs of the *Mohasco Industries* due process analysis. *LAK, Inc. v. Deer Creek Enter.*, 885 F.2d 1293, 1303 (6th Cir. 1989).

C

One final point bears mention. H&B suggests that as a matter of policy, this Court should exercise jurisdiction over Defendants; "[o]therwise, a thief could avoid litigation by laundering stolen property to a person outside the jurisdiction and evading the reach of authorities within that jurisdiction." [DN 20 at 2.] But in H&B's hypothetical, the thief would surely subject himself to the jurisdiction of Kentucky courts by engaging in "wrongful conduct targeted at a plaintiff in the forum state." *Spectrum Scan,* 519 F. Supp. 2d at 660; *see* KRS 454.210(2)(a)(3). As to the recipient, H&B's own cases demonstrate that the knowing recipient of stolen goods may be haled into court at the site of the theft without offending due process. *See Filipowski*, 2000 WL 983727, at *4; *Pag-Daly City*, 2013 WL 4510392, at *3.

However, H&B's hypothetical may be accurate with respect to Kentucky's long-arm statute. As explained above, it is possible for personal jurisdiction to be proper under the due process clause, but still fall short of the requirements of KRS 454.210. While no Kentucky court has addressed the issue since *Caesars*, the long-

arm statute's plain language would seem to foreclose jurisdiction over a non-resident recipient of stolen property with no other ties to the Commonwealth, even if the recipient knew the property was stolen. In that scenario, the recipient would not have undertaken "an act or omission in this Commonwealth," so no personal jurisdiction would lie in Kentucky. KRS 454.210(2)(a)(3). It may very well be the case that Kentucky's public policy favors the exercise of personal jurisdiction over out-of-state individuals who knowingly receive property wrongfully taken from the state. But that is for Kentucky's General Assembly to decide in the first instance. This Court's "task is to apply the text, not to improve upon it." *King v. Burwell*, ___ U.S. ___, 135 S. Ct. 2480, 2505 (2015) (Scalia, J., dissenting) (quoting *Pavelic & LeFlore v. Marvel Entm't Grp., Div. of Cadence Indust. Corp.*, 493 U.S. 120, 126 (1989)).

## V

"The traditional jurisprudential premise [is] that the plaintiff should seek out the defendant." *LAK, Inc. v. Deer Creek Enter.*, 885 F.2d 1293, 1299 (6th Cir. 1989) (citation and internal quotation marks omitted). While the strict requirement of territoriality has eroded over time, it is still the case "that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation marks and citations omitted). To recover George Sisler's bat, H&B must play an away game.

For the foregoing reasons, IT IS HEREBY ORDERED:

Defendants' motion to dismiss for lack of personal jurisdiction [DN 14] is GRANTED. All claims against Defendants Christies Inc., 33 Collections LLC, 33 Baseball Foundation, and Mark Roberts are DISMISSED WITHOUT PREJUDICE.

CC: Counsel of Record